# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 96-2964

_____

Hollis   D.   Stabler,   Jr.;   Sharon   Freemont;   *
Omaha Tribal Historical Project, Inc.; *
Red Feather Family Services, Inc.,   *
                                     *
    Plaintiffs-Appellees,   *
                                     *
    v.   *
                                     *
County of Thurston, Nebraska; Mark   *
Casey,   in   his   official   capacity   as   Chair
      *
of   the   Board   of   Supervisors   of   Thurston
      *
County, Nebraska,   *
                                     *   Appeals from the United States
    Defendants-Appellants.   *   District Court for the
                                     *   District of Nebraska
Thurston County School District 13,   *
Thurston County, Nebraska; Village of   *
Walthill, Nebraska; Steve Dunn, in his *
official   capacity   as   Chair   of   the   Village
      *
of   Walthill   Board   of   Trustees;   Patricia
      *
Higgins,   in   her   official   capacity   as   County*

Clerk of Thurston County, Nebraska;   *
Keith   Mahaney,   in   his   official   capacity
      *
as President of Thurston County School *
District 13,   *
                                     *
    Defendants.   *

_____

No. 96-3111
_____

Hollis   D.   Stabler,   Jr.;   Sharon   Freemont;
    *
Omaha Tribal Historical Project, Inc.; *
Red Feather Family Services, Inc.,  *
                                    *
    Plaintiffs-Appellants,          *
                                    *
    v.                              *
                                    *
County of Thurston, Nebraska; Mark *
Casey,   in   his   official   capacity   as   Chair
    *
o f   the   Board   of   Supervisors   of   Thurston
    *
County, Nebraska, Thurston County   *
School District 13, Thurston County,   *
Nebraska; Village of Walthill, Nebraska; *
Steve     Dunn,    in    his    official    capacity    as
    *
Chair   of   the   Village   of   Walthill   Board
    *
of Trustees; Patricia Higgins, in her  *
official capacity as County Clerk of   *
Thurston County, Nebraska; Keith    *
Mahaney, in his official capacity   *
as President of Thurston County School *
District 13,                        *
                                    *
    Defendant - Appellees..        *
                            _____

                            Submitted: May 19, 1997

                            Filed: December 1, 1997
                            _____

-2-

Before McMILLIAN, ROSS and FAGG, Circuit Judges.

McMILLIAN, Circuit Judge.

Defendant County of Thurston, Nebraska (Thurston County), appeals from a final order entered in the United States District Court[1] for the District of Nebraska holding that the districting plan for the election of the Thurston County Board of Supervisors (the County Board) violates section 2 of the Voting Rights Act of 1965 (§ 2), as amended, 42 U.S.C. § 1973, and ordering Thurston County to create a third majority-minority district for such elections. Stabler v. County of Thurston, No. 8:CV93-00394 (D. Neb. Aug. 29, 1995). For reversal, Thurston County argues that the district court erred in: (1) considering total population and voting age population to determine proportionality; (2) applying the totality of the circumstances test; and (3) finding that the districting plan violated § 2. Plaintiffs Hollis D. Stabler, Jr., Sharon Freemont, Omaha Tribal Historical Project, Inc., and Red Feather Family Services (collectively, "plaintiffs") cross-appeal from that part of the order entered in favor of defendants Thurston County School District 13 (School District 13) and Village of Walthill (the Village) holding that the districting plan used to elect both the District's school board (the School Board) and the Village's Board of Trustees (the Village Board) does not violate § 2 or the First, Thirteenth, Fourteenth, or Fifteenth Amendments to the United States Constitution. Id. On cross-appeal, plaintiffs argue that the district court erred in holding that plaintiffs failed to satisfy the three Gingles[2] preconditions for a § 2 claim. For the reasons discussed below, we affirm the order of the district court.

---

[1]The Honorable Lyle E. Strom, Senior United States District Judge for the District of Nebraska.

[2]Thornburg v. Gingles, 478 U.S. 30 (1986).

Jurisdiction was proper in the district court based upon 28 U.S.C. §§ 1331, 1343(a)(4), and 2201. Jurisdiction on appeal is proper based upon 28 U.S.C. §1291. The notices of appeal and cross-appeal were timely filed under Fed. R. Civ. P. 4(a).

## I. Background

The following facts are taken from the district court's memorandum opinion. Slip op. at 1-2, 6-8, 19-20. The Omaha and Winnebago Indian Reservations are located in eastern Thurston County, which lies in northeast Nebraska. Accordingly, Thurston County has a substantial Native American population concentrated in the eastern half of the county. The Village is a small community located in eastern Thurston County. School District 13, which serves the Village and the surrounding area, has a student body population which, during the 1994-1995 school year, was 80% Native American.[3] The individual plaintiffs, Hollis Stabler, Jr., and Sharon Freemont, are Native American citizens and voters in Thurston County, School District 13, and the Village. The organizational plaintiffs, Omaha Tribal Historical Project, Inc., and Red Feather Family Services, are located in Thurston County.

In 1979, the County Board entered into a consent decree which created its current method of election. The County Board is composed of seven members elected from single-member districts, with each member holding a four-year term. Members are nominated in partisan primary elections and elected in general elections in even numbered years. Four members (Districts 1, 3, 5, and 7) are elected in gubernatorial election years, while three members (Districts 2, 4, and 6) are elected in presidential election years. The County Board drew the district lines to create two Native American majority districts, providing Native Americans in Thurston County with representation

---

[3] Brief for Appellees/Cross-Appellants at 19, <u>citing</u> plaintiffs' exhibit no. 19.

on the County Board in proportion to their 28.5% share of the total population in 1979. (Two of seven County Board seats = 28.57%.) Following the 1980 census, the County Board redistricted and again created two Native American majority districts. At that time, non-whites made up 33.8% of Thurston County's total population.[4] According to the 1990 census, of Thurston County's total population, 43.92% are Native Americans and 55.67% are whites. Of Thurston County's voting age population (VAP), 35.9% are Native Americans and 63.54% are whites.

Following the 1990 census, the County Board created the districting scheme challenged by plaintiffs. In Districts 4 and 6, which are the majority-minority districts, Native Americans constitute a majority of the total population (87.9% and 96.9%, respectively) and the VAP (82.8% and 94.5%, respectively). Whites constitute a majority of the total population and the VAP in the other five districts. However, in Districts 2, 3, and 5, Native Americans represent a substantial portion of the total population (41.2%, 30.9%, and 46.3%, respectively) and the VAP (36.9%, 22.7%, and 36.4%, respectively). Only Districts 1 and 7 contain nominal Native American populations.

The School Board is composed of six members, each elected at-large to a four-year term. Three members are elected every two years in a non-partisan primary election in May and a non-partisan general election in November. The winners in each primary election are the top six finishers determined by a plurality vote method, and the winners of the general election are the top three finishers by plurality vote.

The Village Board is composed of five members, each elected at-large to a four-year term. Three members are elected in a non-partisan general election held in May

---

[4]The district court found that, statistically, the terms "non-white" and "Native American" are "virtually synonymous." Stabler v. County of Thurston, No. 8:CV93-00394, slip op. at 7 n.3 (D. Neb. Aug. 29, 1995).

of the gubernatorial election year, and two members are elected in a general election held in May of the presidential election year. The winners in each general election are the top three (or two) finishers determined by a plurality vote method.

Plaintiffs filed suit against Thurston County, School District 13, and the Village, alleging that the districting plan used to elect the County Board and the at-large method used to elect the School Board and the Village Board violate § 2 of the Voting Rights Act of 1965 and the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution by diluting the voting strength of Native Americans in Thurston County and in the Village. Plaintiffs alleged that the current districting system used to elect the County Board packs most of Thurston County's Native American population into Districts 4 and 6 and fragments the remaining Native American population among Districts 2, 3, and 5. Because the Native American population in Thurston County has increased, as a percentage, from 28.5% in 1979 to 43.92% in 1990, plaintiffs sought the creation of a third Native American majority district for the election of the County Board. Plaintiffs also sought to implement single-member or multi-member districting plans for the election of the School Board and the Village Board. Regarding the School Board, plaintiffs offered two alternative districting plans: one plan features two three-member districts; the other plan features six single-member districts. Regarding the Village Board, plaintiffs offered a plan featuring two single-member districts and one three-member district.

The district court conducted a bench trial on the issues from May 30, 1995, until June 2, 1995. With respect to the County Board, the district court found that it is possible to create another majority-minority district because: the minority group (Native Americans) is sufficiently large and geographically compact; the minority group is politically cohesive; and the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate. Slip op. at 13-15. The district court then examined the totality of the circumstances, determined that the County Board's districting plan does not provide Native American voters representation on the County

Board which is "roughly proportional" to their total and voting age populations, and concluded that the challenged plan violates § 2 by diluting the voting strength of Native American voters. Id. at 18. The district court ordered the County Board to submit a districting plan to create a third Native American majority single-member district. Id. The County Board timely submitted a plan and subsequently submitted an amended plan to correct some mathematical errors. The amended remedial plan was approved by the district court on June 26, 1996, and is scheduled to be phased into place beginning with the 1998 elections.

With respect to the School Board and the Village Board, the district court held that, while the parties were able to draw a single-member district in which Native Americans constitute a majority, the boundaries of those districts would be highly irregular and the result would be racially gerrymandered districts. The district court held that such irregularly-drawn districts would run afoul of the equal protection clause because they were drawn principally for racial considerations. Id. at 20, citing Miller v. Johnson, 515 U.S. 900 (1995) (Miller), and Shaw v. Reno, 509 U.S. 630 (1993). The district court further held that the challenged jurisdictions are so small that no feasible single-member or multi-member districting plan can be drawn because it would be inflexible to any change in the district's racial composition. Therefore, the district court found that the protected group, Native Americans, is not sufficiently large and geographically compact to justify a majority-minority district for the School Board or the Village Board elections. Id. The district court also held that plaintiffs did not prove a constitutional violation because they could not show that there was a racially discriminatory purpose and effect in establishing the at-large election systems for the School Board and the Village Board. Id. at 21-22. Thurston County's appeal and plaintiffs' cross-appeal followed.

## II. Discussion

In a § 2 case, we review the district court's findings "regarding the factual context giving rise to the claim" for clear error. Harvell v. Blytheville Sch. Dist. No. 5, 71 F.3d 1382, 1386 (8th Cir. 1995) (en banc) (Harvell), cert. denied, 116 S. Ct. 1876 (1996). However, the district court's legal conclusions, "'including those that may infect so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law,' are subject to plenary review." Id., quoting Thornburg v. Gingles, 478 U.S. 30, 78-79 (1986) (Gingles).

A voting procedure violates § 2 if it has the "result" under the "totality of the circumstances" of affording minority voters less opportunity than white voters "to elect representatives of their choice." 42 U.S.C. § 1973(b). A successful § 2 claimant must show three necessary preconditions: (1) the minority group is sufficiently large and geographically compact to constitute an effective majority in a single-member district; (2) the minority group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. Gingles, 478 U.S. at 50-51. These three preconditions apply to challenges to single-member districts as well as multi-member districts. Growe v. Emison, 507 U.S. 25, 40-41 (1993). "When applied to a claim that single-member districts dilute minority votes, the first Gingles condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." Johnson v. De Grandy, 512 U.S. 997, 1008 (1994) (Johnson). Once the preconditions are met, § 2 plaintiffs must further show that, under the totality of the circumstances, vote dilution has occurred because the challenged plan denies minority voters equal political opportunity. Id. at 1011-12; Gingles, 478 U.S. at 43. The factors to be considered include: (1) a history of official discrimination in the political subdivision that touched the right of minority group members to register, vote, or otherwise participate in the democratic process; (2) the extent to which voting in the elections of the political subdivision is racially polarized; (3) the political

-8-

subdivision's use of unusually large election districts, majority-vote requirements, anti-single shot provisions (discouraging voters from using only one of their multiple votes), or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) whether the minority group members have been denied access to a candidate-slating process, where one exists; (5) the extent to which minority group members in the political subdivision bear the effects of discrimination in such areas as education, employment, and health which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; and (7) the extent to which minority group members have been elected to public office in the jurisdiction. See Gingles, 478 U.S. at 36-37. Additional factors that may be probative of vote dilution are: (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group and (9) whether the policy underlying the political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous. See id. at 37.

A.     Thurston County's Appeal

1.     Proportionality

Thurston County argues that the district court erred in basing its proportionality determination on both total population and VAP figures because only VAP should be considered. Thurston County contends that, in African Am. Voting Rights Legal Defense Fund, Inc. v. Villa, 54 F.3d 1345, 1352 (8th Cir. 1995) (Villa) (citing Johnson, 512 U.S. at 1013-14 & n.11), cert. denied, 116 S. Ct. 913 (1996), this court recognized that "Johnson consistently defines the relevant population as the voting age population." It claims that the Supreme Court left open the question whether another population base could be used (e.g., total population). Thurston County maintains that,

because the district court relied on the VAP, it erred in also considering the total population.

Thurston County also argues that the district court erred in holding that the County Board is required to provide "proportional representation" to minority voters. Rather, Thurston County contends that substantial proportionality is sufficient because 42 U.S.C. § 1973(b) provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Thurston County suggests that the district court confused the concepts of "proportional representation" and "proportionality" and erroneously focused its determination on proportional representation, which refers to the success of minority group member candidates, rather than on "proportionality," which "links the number of majority-minority voting districts to minority members' share of the relevant population." See Johnson, 512 U.S. at 1014 n.11. Thurston County maintains that the number of majority-minority voting districts provided by its districting plan (2 of 7 districts, or 28.5%) is substantially proportional to Native Americans' 35.9% share of the VAP.

We disagree and hold that the district court did not err in finding that the challenged districting plan lacks proportionality. See slip op. at 17-18. "While [rough] proportionality is not dispositive in a challenge to single-member districting, it is a relevant fact in the totality of circumstances to be analyzed." Johnson, 512 U.S. at 1000. The creation of a third majority-minority district would increase the share of majority-minority districts to 42.86% of all districts and would create closer proportionality than the current two majority-minority districts plan (28.57%), whether total population (43.92%) or VAP (35.9%) is considered. Under the current plan, Native Americans are under-represented by more than 7% considering VAP and 15% considering total population. Under the district court's plan, Native Americans would be over-represented by less than 7% considering VAP and under-represented by less than 1.5% considering total population. Whether we consider the total population or

the VAP, the proposed three majority-minority districts plan results in less disparity than the current plan and more closely approximates rough, or substantial, proportionality, as discussed in Johnson, 512 U.S. at 1023, in which the Supreme Court upheld a districting plan with approximately a 2% population disparity, and in Villa, 54 F.3d at 1353, in which this court approved a districting plan with less than a 1% disparity.

Furthermore, Thurston County mischaracterizes "substantial proportionality" as "the maximum number of majority-minority districts possible without exceeding proportionality." Brief for Appellants/Cross-Appellees at 20 n.1, citing Rural West Tennessee African-Am. Affairs Council, Inc. v. McWherter, 877 F. Supp. 1096, 1107 n.12 (W.D. Tenn.), aff'd sub nom. Rural West Tennessee African-Am. Affairs Council, Inc. v. Sundquist, 116 S. Ct. 42 (1995) (mem.). Only in a rare case will the population ratios match the fractions of the number of districts such that one group is not over-represented. There is no reason why the Native American minority in this case should continue to bear the burden of under-representation under the current scheme while the white majority enjoys over-representation. The creation of a third majority-minority district will not harm non-Native Americans because the evidence does not show that Native Americans vote as a bloc to defeat white voters' candidates of choice. Moreover, the evidence indicates that Thurston County intentionally discriminated against Native Americans because it failed to make adjustments during the 1990 redistricting process in response to the information gathered in the 1990 census demonstrating a shift in the population's racial composition due to the increased Native American population. This evidence shows that Thurston County maintained its current districting system with a discriminatory intent and thwarted Congress's purpose in amending § 2 in 1982 to provide "equally open" political processes. See Johnson, 512 U.S. at 1018-19.

2.      Totality of the Circumstances

While conceding that plaintiffs satisfied the three Gingles preconditions, Thurston County argues that the district court erred in finding that plaintiffs satisfied the totality of the circumstances test.  Thurston County claims that there is no evidence of past discrimination affecting Native Americans' voting strength.  It asserts that, in fact, it has taken measures to make it easier for Native Americans to participate in the voting process by  sending the county clerks to various communities to register voters. Thurston County also claims that, while some evidence was offered to show racially polarized voting, the evidence also showed that Native Americans and whites in Thurston County have sometimes shared a preferred candidate.  Thurston County also claims that:  none of its voting practices or procedures enhance the opportunity for discrimination against Native Americans because unusually large election districts are not used; members of the County Board are elected by plurality, rather than majority, vote; anti-single shot provisions were not used; and County Board elections do not involve a candidate-slating process but, rather, use an open primary system.  Thurston County also argues that plaintiffs failed to show any causal link between the lingering effects of discrimination and Native Americans' ability to participate in the political process.  Specifically, Thurston County contends that plaintiffs failed to show any lingering economic disparities resulting from discrimination in education, employment, and health.  Thurston County asserts that plaintiffs cannot show economic disparity because recent developments (a casino) have given Native Americans an economic boost.  Thurston County also contends that witnesses testified that the political campaigns are not characterized by overt or subtle racial appeals.  As for the extent to which Native Americans are elected to the County Board, Thurston County refers to the regular election of Native Americans in District 6 and the realistic potential to elect a Native American in District 4 (because it is a majority-minority district) even though non-Native Americans have historically been elected in that district.  Thurston County also contends that the County Board regularly consults and cooperates with the Omaha and Winnebago Tribes and concludes that its decision not to create a third majority-

minority district is not tenuous because it has already created majority-minority districts in proportion to Native Americans' share of the VAP.

We disagree and hold that the district court's finding that, under the totality of the circumstances, Native Americans do not have equal access to the political process in Thurston County is not clearly erroneous. See slip op. at 18. As stated above, under Johnson, 512 U.S. at 1000, proportionality is a relevant factor to be considered in the totality of the circumstances analysis. While plaintiffs must still show that, under the totality of the circumstances, the current voting scheme provides them with less opportunity than other voters to participate in the electoral process and elect representatives of their choice, see 42 U.S.C. § 1973(b), the "[s]atisfaction of the necessary Gingles preconditions carries [] plaintiff[s] a long way towards showing a Section 2 violation." Harvell, 71 F.3d at 1390. The two primary factors considered in the totality of the circumstances analysis are: (1) the extent to which voting is racially polarized and (2) the extent to which minorities have been elected under the challenged scheme. Id., citing Gingles, 478 U.S. at 48-49 n.15. The district court did not clearly err in finding "racial polarization" based upon its analysis of various Thurston County elections from 1978 to 1992 which "indicate that Native Americans overwhelmingly vote for Native American candidates and whites vote for white candidates to defeat the Native American candidate of choice." Slip op. at 14. This finding also explains the lack of success achieved by Native American candidates. Despite the evidence presented by Thurston County that Native Americans have enjoyed "some success in elections and employment," the district court's finding that "racial polarization and minimal white crossover voting results in a legally significant white bloc vote to defeat Native American candidates of choice" is not clearly erroneous. Id.

Other totality factors, while not essential to support plaintiffs' claim, support the district court's finding of a § 2 violation. See Harvell, 71 F.3d at 1390. The district court found that Native Americans bear the effects of social, economic, and educational discrimination and concluded that "it is obvious that Native Americans lag behind

-13-

whites in areas such as housing, poverty and employment." Slip op. at 15-16. We cannot say that these findings are clearly erroneous. Nor can we say that the district court's finding of overt and subtle racial discrimination in the community is clearly erroneous. Id. at 16. Thurston County, School District 13, and the Village each employ only one Native American, and social organizations in Thurston County are not racially mixed. Consequently, the white majority has little interaction with most Native American candidates, and, therefore, the opportunity to become known as a person and to be trusted with public office is not equal. This disparate socio-economic status is causally connected to Native Americans' depressed level of political participation, despite Thurston County's efforts to register Native Americans to vote.

3.    § 2 Findings

Thurston County argues that, even if this court does not reverse the district court's holding regarding proportionality and the totality of the circumstances, the case should be remanded to the district court for detailed findings to enable this court to determine the factual and legal bases for the district court's judgment. Brief for Appellants/Cross-Appellees at 29-30, citing Buckanaga v. Sisseton Ind. Sch. Dist. No. 54-5, 804 F.2d 469, 472 (8th Cir. 1986) (Buckanaga) (requiring district courts to explain with particularity their reasoning and underlying subsidiary factual conclusions in vote dilution claims). Thurston County contends that the district court failed to discuss the substantial evidence contrary to its finding of vote dilution and that its totality of the circumstances analysis was cursory.

We disagree and hold that the district court made adequate factual findings to support its holding and discussed the substantial evidence contrary to its decision as required under Fed. R. Civ. P. 52(a) and Buckanaga, 804 F.2d at 472. The district court thoroughly discussed the facts underlying its conclusion that the Gingles preconditions were met in this case and that a violation was shown under the totality of the circumstances. Slip op. at 6-18. Additionally, the district court considered the

evidence presented by Thurston County that "Native Americans have enjoyed some success in elections and employment" and testimony that "Native Americans are active, well-received and productive members of the community." Id. at 16. Further findings by the district court are not necessary.

B.      Plaintiffs' Cross-Appeal

Plaintiffs argue that the district court erred in holding that "plaintiffs cannot prove that Native Americans are sufficiently large and geographically compact to constitute a majority in a single-member district which is regularly drawn and non-bizarrely shaped." Id. at 20. First, plaintiffs claim that the illustrative districting plans for the School Board and the Village Board cannot be described as bizarre in light of the irregularity of those jurisdictions themselves. Plaintiffs contend that their § 2 claim should not be defeated on the basis of gerrymandered districting because a districting plan adopted or imposed as a remedy for a § 2 violation necessarily uses race as part of its basis. Plaintiffs maintain that, if this court conducts an equal protection review of the proposed districting plans, the plans should survive strict scrutiny because the creation of a majority-minority district is reasonably necessary to comply with § 2 and such redistricting substantially addresses the § 2 violation without considering race more than is necessary to remedy the § 2 violation. Brief for Appellees/Cross-Appellants at 46, citing Shaw v. Hunt, 116 S. Ct. 1894, 1905-07 (1996), and Bush v. Vera, 116 S. Ct. 1941, 1960, 1968 (1996) (plurality assumed without deciding that a state's interest in avoiding § 2 liability can be a compelling state interest for purposes of strict scrutiny inquiry, while concurring Justice expressed that compliance with § 2 is a compelling state interest). Furthermore, plaintiffs contend that the proposed districting plans cannot be defeated based solely on their fragile racial composition because Gingles merely requires that § 2 plaintiffs show that, by creating a majority-minority district, the minority possesses the "potential to elect representatives." 478 U.S. at 50 n.17.

Plaintiffs also argue that the district court failed to properly consider all of the evidence of racially polarized voting. Plaintiffs claim that the district court erred in limiting the evidence of voter cohesion and bloc voting to statistical evidence and in failing to consider non-statistical evidence of voting behavior. Plaintiffs maintain that the district court did not consider certain lay witness testimony, the consistent defeat of Native American candidates, the lack of Native American candidates, the "eye balling" of election returns (to make generalizations from the results), and a history of discrimination. For example, plaintiffs especially note the testimony that a white man told his Native American neighbor, who was running for School Board election, that he would move if an Indian was elected to the School Board.

We disagree and hold that the district court did not err in holding that the proposed districting plans were not workable remedies to the challenged practices. See slip op. at 20. The district court justifiably rejected the proposed plans because of the fragile composition of the proposed districts. Id. Under the proposed plans, if 4 or 5 Native Americans moved from the proposed majority-minority districts created for the School Board and Village Board, respectively, and they were replaced by non-Native Americans, the majority-minority composition would be destroyed. Brief for Appellees at 27, 30. Therefore, plaintiffs failed to prove that Native Americans are geographically compact to form an effective voting majority in a single-member district as required under Gingles.

In the alternative, we hold that the district court did not err in holding that the proposed districting plans constitute gerrymandering in violation of the equal protection clause of the Fourteenth Amendment. See slip op. at 20. A districting plan violates the equal protection clause when it is shown, "'either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor' motivating the placement of 'a significant number of voters within or without a particular district.'" Harvell v. Blytheville Sch. Dist. No. 5, No. 97-1364, 1997 WL 590121, at *2 (8th Cir. Sept. 25,

-16-

1997) (to be reported at 126 F.3d 1038), quoting Miller, 515 U.S. at 916. Any remedy drawn in order to correct a § 2 violation should "steer clear of the type of racial gerrymandering proscribed in Miller." Harvell, 71 F.3d at 1391. Bizarre shape is "persuasive circumstantial evidence that race for its own sake, and not other districting principles, was [plaintiffs'] dominant and controlling rationale in drawing [the proposed] district lines." Miller, 515 U.S. at 913. The bizarre shape of the proposed districts, considered in combination with the racial and population densities of the proposed districts, support the district court's finding that race was the predominant factor in drawing the proposed districts to create a majority-minority single-member district and that the proposed redistricting resulted in gerrymandered districts. See id. at 917. "If race is the predominant motive in creating districts, strict scrutiny applies, and the districting plan must be narrowly tailored to serve a compelling governmental interest in order to survive." Abrams v. Johnson, 117 S. Ct. 1925, 1936 (1997) (citation omitted). Even assuming, without deciding, that compliance with § 2 can be a compelling state interest, in the present case, there is "no 'strong basis in evidence' to conclude that vote dilution, in violation of § 2, would occur in consequence of the [challenged districting] plan[s]" because "none of the three Gingles factors, the threshold findings for a vote dilution claim, [have been] established." Id. (citations omitted). Specifically, the district court found, without clear error, that plaintiffs failed to prove that: the Native American population is sufficiently large and geographically compact to constitute an effective majority in a single-member district; Native Americans are politically cohesive; and whites vote as a bloc to defeat Native Americans' preferred candidates. Slip op. at 20-21. Because plaintiffs failed to establish a § 2 violation, the proposed gerrymandered districts cannot survive strict scrutiny.

Finally, the district court did not err in rejecting plaintiffs' proffer of evidence of county-wide voting behavior to prove voter cohesiveness and bloc voting in the School Board and the Village Board elections. While the district court held that the absence of statistical evidence was fatal to plaintiffs' claims, it considered all of the evidence

in determining that plaintiffs failed to prove either cohesiveness or bloc voting. Id. at 21. The district court concluded that evidence gathered from exit polls in 1994 was inconclusive and failed to prove that minority voters were cohesive or that majority voters voted as a bloc. Id. Moreover, a Native American testified at trial that Native Americans have a fair chance of being elected to the School Board and the Village Board. Brief for Appellees at 38, citing Tr. Vol. II at 365:21-25. Therefore, the district court did not err in holding that plaintiffs failed to prove that the School Board and the Village Board elections violated either § 2 or the Constitution.

### III. Conclusion

We commend the district court for its extremely thorough memorandum opinion. We hold that the district court did not err in ordering Thurston County to create a third majority-minority district for elections of the County Board and rejecting plaintiffs' challenge to the districting plans used for the School Board and the Village Board elections. For the reasons set forth above, we affirm the order of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.