_____

No. 93-1009
_____

Shirley M. Harvell; Emmanuel      *
Lofton, Reverend; Hattie          *
Middlebrook; Mary Alice Jones;    *
Jacquelin Henton,                 *
                                  *
          Appellants,             *
                                  *
     v.                           *
                                  *
Blytheville School District #5,   *
A Public Body Corporate;          *
William Tomlinson, Individually   *
and as Board Member; Norvell      *
Moore, Individually and as        *
Board Member; William Sullivan,   *    Appeal from the United States
Individually and as Board         *    District Court for the
Member; Harold Sudbury, Jr.,      *    Eastern District of Arkansas.
Individually and as Board         *
Member; Helen Nunn,               *
Individually and as Board         *
Member; Karen Fraser,             *
Individually and as Board         *
Member; Steve Littrell,           *
Individually and as Board         *
Member; William Stovall, III,     *
also known as Bill Stovell,       *
Individually and Board Member;    *
Blytheville School District       *
#5, Board of Directors; Dr.       *
Frank Ladd, Individually and in   *
his official capacity as          *
Superintendent of Blytheville     *
School District No. 5,            *
                                  *
          Appellees.              *

_____

Submitted:  April 13, 1995

Filed:  December 5, 1995
_____

Before RICHARD S. ARNOLD, Chief Judge, McMILLIAN, FAGG, BOWMAN,
    WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD,
    and MURPHY, Circuit Judges, En Banc.

_____

WOLLMAN, Circuit Judge.

Shirley Harvell and other voters filed suit in 1989, challenging the election procedure for school board members in the Blytheville, Arkansas, school district as violative of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 ("VRA").  The district court dismissed the complaint, finding that Harvell failed to set forth a prima facie violation of Section 2. Harvell v. Ladd, 759 F. Supp. 525, 529-30 (E.D. Ark. 1991).  We reversed and remanded to the district court for further findings concerning the factors set forth in Thornburg v. Gingles, 478 U.S. 30, 36-37 (1986). Harvell v. Ladd, 958 F.2d 226, 230 (8th Cir. 1992).  On remand, the district court again dismissed the complaint because it found that Harvell failed to establish that the unsuccessful black candidates were the minority's preferred candidates.  We again reversed in part the district court's subsequent decision following remand, but affirmed its denial of sanctions against Harvell.  Harvell v. Blytheville Sch. Dist. #5, 33 F.3d 910 (8th Cir. 1994).  We subsequently agreed to rehear the case en banc and vacated the panel opinion.  We now reverse the decision of the district court in part and affirm the denial of sanctions.

**I.**

The underlying facts of this dispute are set out in detail in our earlier opinions.  The voting age population of the Blytheville school district is 14,500, of which 70% is white and 29% black.[1]  Each member of the eight member at-large school board serves a four-year term, and two terms expire each year.  Historically,

---

[1]These are the 1980 census figures that were used at trial. According to the 1990 census, the Blytheville school district has a total population of 23,057, of which approximately 37% are black and 62% white, but we do not have the relevant voting age populations before us.

school board elections were determined by a plurality vote. In 1987, however, the Arkansas legislature altered the voting scheme for school board elections from one of plurality to one of majority, which would occasion the need for a run-off election between the voter-preferred candidates in the event that no candidate was able to garnish a majority of the voters in the initial election. Ark. Code. Ann. § 6-14-121. All winning candidates since 1987 have been elected by a majority of votes cast in the first round. Following two elections under this scheme Harvell filed suit. None of six separate black candidates has defeated a white candidate in eight attempts following the 1987 election, although Dr. Helen Nunn was reseated without opposition in 1990.[2]

## II.

To mount a successful challenge to multi-member districts under Section 2,[3] a plaintiff must initially satisfy the three preconditions delineated in Gingles. These preconditions are 1) that the minority group is large enough and geographically compact enough that it would be a majority in a single-member district; 2) that the minority group is politically cohesive; and 3) that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. 478 U.S. at 50-51. Gingles also set forth nine non-exclusive factors mentioned in the Senate report accompanying the VRA to assist in determining whether, under the totality of the circumstances, a challenged electoral scheme dilutes the minority vote. These include (1) the history of

---

[2]Appendix I contains the vote breakdown by candidate for each election in which a black candidate has run.

[3]This vote dilution claim is "analytically distinct" from a challenge to voting districts on equal protection grounds. Miller v. Johnson, 115 S. Ct. 2475, 2485 (1995) (quoting Shaw v. Reno, 113 S. Ct. 2816, 2830 (1993)).

-3-

voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the state or subdivision is racially polarized; (3) the extent to which the state or subdivision has used voting practices or procedures that tend to enhance opportunities for discrimination against the minority group; (4) whether minority candidates have been denied access to any candidate-slating process; (5) the extent to which minorities have borne the effects of past discrimination in relation to education, employment, and health; (6) whether local political campaigns have used overt or subtle racial appeals; (7) the extent to which minority group members have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group; and (9) whether the policy underlying the use of voting qualifications is tenuous. 478 U.S. at 36-37.

We must analyze the elements of a Section 2 case in context, according deference to the district court where necessary and applying legal constructs where appropriate. The district court's findings regarding the factual context giving rise to the claim are reviewed for clear error. See Gingles, 478 U.S. at 78-79. But the legal conclusions it employs, "including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law," are subject to plenary review. Id. at 79 (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485 (1984).

The district court found that Harvell established the first two Gingles preconditions at trial. The school district does not contest these findings of geographic compactness and political cohesiveness. We therefore accept them as established. The district court also found that voting in the school board elections is racially polarized. Harvell, 759 F. Supp. at 527-28. This undisputed finding is borne out by the record and weighs heavily in

favor of finding the third <u>Gingles</u> precondition established. <u>Jeffers v. Clinton</u>, 730 F. Supp. 196, 205 (E.D. Ark. 1989) (three-judge court), <u>aff'd mem.</u>, 498 U.S. 1019 (1991); <u>Smith v. Clinton</u>, 687 F. Supp. 1310, 1314-15 (E.D. Ark. 1988) (three-judge court) <u>see</u> <u>Collins v. City of Norfolk</u>, 816 F.2d 932, 935 (4th Cir. 1987) (existence of polarization establishes the power of white bloc voting).  The district court found, however, and the school district contends, that the low voter turnout sufficiently indicates that the minority candidates in the elections from 1988 to 1992 were not preferred by the minority voters and precluded Harvell from satisfying the third <u>Gingles</u> precondition.  Harvell asserts, and we agree, that the district court misapprehended the definition of who is eligible for "minority-preferred candidate" status and that the evidence establishes that the candidates in those elections were in fact the minority-preferred candidates.

We do not categorically state that a candidate is the minority-preferred candidate simply because that candidate is a member of the minority.  Such stereotyping runs afoul of the principles embodied in the Equal Protection Clause.  <u>See</u> <u>Miller</u>, 115 S. Ct. at 2486 (state assignment of voters on basis of racial assumptions is "offensive and demeaning"). <u>But see</u> <u>Jenkins v. Red Clay Consol. Sch. Dist Bd. of Educ.</u>, 4 F.3d 1103, 1126 (3d Cir. 1993) (stating that "practical experience leads to the inference that any particular minority candidate is minority-preferred"), <u>cert. denied</u>, 114 S. Ct. 2779 (1994).  Accordingly, such an inference is insufficient to establish that any particular candidate is minority-preferred.  The preferences of the minority voters must be established on an election-specific basis, viewing all the relevant circumstances.  <u>See</u> <u>Jenkins</u>, 4 F.3d at 1126.

The record makes clear in this case that the race of a candidate is by far the determinative factor in minority voting patterns in Blytheville school board elections.  Harvell's regression analysis strongly supports the conclusion that those

-5-

black candidates who did run in the elections from 1988-1992 were in fact the minority-preferred candidates.[4]  See id. (inference derived from candidate's race combined with statistical evidence of voting patterns is sufficient to establish minority preference); Clarke v. City of Cincinnati, 40 F.3d 807, 810 n.1 (6th Cir. 1994) ("[C]ourts generally have understood blacks' preferred candidates simply to be those candidates who receive the greatest support from black voters."), cert. denied, 115 S. Ct. 1960 (1995); see also Jeffers, 730 F. Supp. at 208 (noting race-conscious voting behavior of Arkansans).  The school district does not contest this statistical evidence and offers no other evidence to contradict the statistical preference.  The consistency of the data over time lends additional support to this conclusion.  Gingles, 478 U.S. at 57.

There may be situations in which voter apathy may be linked to disapproval of a particular candidate, but there is no indication that such is the case here.  The silence of the minority voters is not so deafening as to warrant a finding that they disapproved of six different minority candidates in light of the uncontroverted statistical evidence that supports a finding of overwhelming support from those blacks who did vote.  Nor are the numbers so low as to reduce their statistical significance to a nullity.  Speculation regarding reasons for low minority turnout is inappropriate.  Gomez v. City of Watsonville, 863 F.2d 1407, 1415-16 (9th Cir. 1988) (looking at actual voting patterns to determine political cohesion rather than turnout rates), cert. denied, 489 U.S. 1080 (1989). The school district's interpretation of the low turnout underestimates the legal significance of the years of polarized voting evident in the Blytheville school board elections.  See Gingles, 478 U.S. at 57; see also Clark v. Calhoun County, 21 F.3d 92, 96 (5th Cir. 1994) (ability of majority to defeat the

_____

[4]Appendix II contains the results of Harvell's expert statistical evidence.

minority-preferred candidate is "ordinarily established through evidence of racially polarized voting"). Similarly, the related natures of cohesiveness, polarization, and bloc voting demonstrate the incongruity of any reliance on low voter turnout in this case. See Clark, 21 F.3d at 96; Jenkins, 4 F.3d at 1133 n.32 (discussing relation between political cohesiveness and the minority-preferred candidate); Collins v. City of Norfolk, 883 F.2d 1232, 1237 (4th Cir. 1989) (polarization relevant to determination of cohesiveness and whether white bloc voting defeats minority-preferred candidates); Collins, 816 F.2d at 935 ("[T]he existence of racially polarized voting . . . establishes both cohesiveness of the minority group and the power of white bloc voting to defeat the minority's candidates.") (emphasis omitted); see also Gingles, 478 U.S. at 52 n.18 (noting interchangeable use of polarization and bloc voting); United States v. Marengo County Comm'n, 731 F.2d 1546, 1567 (11th Cir.) ("The surest indication of race-conscious politics is a pattern of racially polarized voting."), cert. denied, 469 U.S. 976 (1984). The fact that black candidates have lost universally in contested post-1987 elections cannot be explained away simply on the basis of the black electorate's dissatisfaction with its candidates. In the face of the finding of consistent polarization, a legally significant white cross-over vote does not exist under the current election scheme. Cf. Cane v. Worcester County, 35 F.3d 921, 926 (4th Cir. 1994) (finding average 19% white crossover vote insufficient to salvage at-large, one-on-one election scheme under the facts of that case), cert. denied, 115 S. Ct. 1097 (1995).

That some minority-preferred candidates did achieve electoral success under the old system does not necessitate a finding that those minority candidates who do not now succeed are not the minority's preferred candidates, particularly when no candidates in these elections received greater minority voter support. Moreover, we should not require as a condition to a finding of minority-preferred status heroic, mythic qualities of candidacy better

suited to a romantic view of the electoral process than to the rough-and-tumble world of contested elections.  Much as the relevant population is the population able to vote, see African Am. Voting Rights Legal Defense Fund, Inc. v. Villa, 54 F.2d 1345, 1352 (8th Cir. 1995), the relevant candidate should generally be one able to receive those votes, not some idealized figure whose absence from the ballot keeps a disappointed electorate at home.  Under the school district's proffered view, the black voters of Blytheville have gone five consecutive years, six candidates, and eight campaigns without stating a preference, a proposition we cannot accept.

There are a number of factors in addition to the statistical data that indicate that the district court's reliance on low turnout is too speculative.  Low voter turnout can be explained by any number of socio-economic factors, or may be explained by unabashed voter apathy.  It does not, however, lend itself so easily to an inference of a sub silentio predisposition against any particular minority candidate.  Not only were the minority turnouts low, but voter turnout as a whole for these elections has been historically low.  Additionally, we note that following the change in the law the average vote totals declined for both white and minority candidates, although much more precipitously for black candidates.  In light of the fact that low voter turnout has often been considered the result of the minority's inability to effectively participate in the political process, see Gomez, 863 F.2d at 1416 n.4; United States v. Dallas County Comm'n, 739 F.2d 1529, 1538 (11th Cir. 1984), it stands to reason that when an external stimulus dampens the white turnout it may impact even more greatly on a group that has faced historic disadvantages.[5]

_____

[5]We further note that in 1990 the polling place of a precinct known as a historic black voter stronghold was moved to a predominantly white area.  Although there is no evidence that this move was predicated on an attempt to suppress the black vote, our inquiry looks to the effect of voting practices on equal political opportunity rather than to their intent, see Chisom v. Roemer, 501 U.S. 380, 383-84 (1991); Jeffers, 730 F. Supp. at 203-04, and the 1990 election produced a record low black voter turnout for that particular precinct.

Similarly, black voters need have only looked at their plurality successes in 1974 and 1975 to realize that they faced a much lower possibility of success under the present scheme. This may also account for the lower turnout. Finally, varying election dates, the number of seats up for election, and the presence or absence of other ballot issues that may draw the electorate to the polls also have an impact on turnout. Such considerations have no bearing on whether the candidates who ran were or were not the minority-preferred candidates. Indeed, there are so many possibilities for explaining the low turnouts that selecting any one in this case is purely impermissible speculation.

Nor can we accept the school district's attempts to characterize the unsuccessful candidates as militant fringe candidates who disenfranchised themselves from the black community. There is no evidence in the record that the minority community viewed any of the six different candidates as in any way inadequate representatives of its interests. In the absence of any such evidence, the countervailing voting patterns conclusively rebut these denigrations.

The school district relies heavily on the historical fact of proportional or near proportional representation of the black population on the school board as evidence of the election scheme's validity. At the outset we note that proportional representation is an important factor to consider in evaluating the validity of an electoral process. It is not, however, the statutory touchstone, and does not provide an absolute safe harbor in which a defendant can seek refuge from the totality of the circumstances. See

<u>Johnson v. De Grandy</u>, 114 S. Ct. 2647, 2660-61 (1994);[6] <u>Barnett v. Daley</u>, 32 F.3d 1196, 1202 (7th Cir. 1994); <u>see also</u> <u>Zimmer v. McKeithen</u>, 485 F.2d 1297, 1307 (5th Cir. 1973) (listing possible explanation for success at the polls despite vote dilution), <u>aff'd sub nom.</u>, <u>East Carroll Parish Sch. Bd. v. Marshall</u>, 424 U.S. 636 (1976).  Just as proportional representation is not mandated under Section 2, it also does not preclude finding a violation, because racial reference points do not necessarily reflect political realities.  <u>See</u> <u>De Grandy</u>, 114 S. Ct. at 2661-62 & n.17 (probative value of proportionality varies with the facts).  Similarly, the white majority has no right under Section 2 to ensure that a minority group has absolutely no opportunity to achieve greater than proportional representation in any given race.

The proportional representation on which the school district relies rests on infirm ground.  The electoral success that black candidates achieved under the plurality system is no longer present.  No black candidate has won a contested election since the change in the law.  The district contends that none of those candidates would have won under a plurality system either, thus proving that the majority vote requirement is not to blame, and further requiring us to weigh heavily the historic successes of black candidates in rejecting Harvell's complaints.  This sort of back-to-the-futurism on the part of the school district cannot withstand analysis, for if we control the results of the elections prior to 1988 with the majority vote requirement, it becomes plain that no proportional representation would have occurred in the past.  Both the 1974 and 1975 elections would have gone to white

---

[6]<u>De Grandy</u> resolved a claim involving "proportionality," which "links the number of majority-minority voting districts to minority members' share of the relevant population."  114 S. Ct. at 2658 n.11.  Here, because we address a claim involving a single at-large district, the analyses between proportionality and proportional representation are essentially the same.  <u>Cf.</u> <u>Villa</u>, 54 F.3d at 1352-53 n.10 (distinguishing proportional representation in case involving proportionality claim and single-member districts).

candidates under this scenario; thus, Norvell Moore would have never won initially to enable him to serve multiple terms as a mostly unopposed incumbent. Dr. Nunn's 1982 victory would have provided the only successful black candidate in Blytheville history had the current scheme been in place then. Such success does not indicate substantial minority voting strength, nor does it indicate the presence of a consistent, legally significant white cross-over vote.

Further, even accepting the historical effects of the plurality element, most of the elections won by black candidates were done so as incumbents in the face of no opposition. This is precisely the type of special circumstance recognized in Gingles as not vitiating any element of the claim. 478 U.S. at 51. Even in an extreme case of total vote dilution a candidate running in the face of no opposition is ensured success. The two instances in which a black candidate beat a white candidate head-to-head involved Moore's 23-vote victory as a three-term incumbent[7] against a candidate who was not even the white majority's preference as a previous candidate, and Dr. Nunn's election in 1982. So in the final analysis, when those campaigns involving readily apparent special circumstances are removed, black candidates still have won only one election in thirteen attempts since 1969, fitting precisely in the Gingles test as to whether the white majority does indeed vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Gingles, 478 U.S. at 51.

---

[7]We agree that incumbency is the least "special" of the special circumstances, compare Clarke, 40 F.3d at 813-14 (de-emphasizing incumbency element) with Collins, 883 F.2d at 1243 (emphasizing the importance of incumbency), but accept its potential as such and view this election as a special circumstance because of the multiple incumbency, board composition, and opposition involved.

We emphasize that we are not assessing the validity of the law that existed prior to 1988. It no longer exists, and its legitimacy is inconsequential. The election results under that scheme and the type of representation they yielded, however, are relevant to our inquiry to the extent that the past political reality sheds light on the totality of the circumstances of the present scheme. Proportional representation may well have sufficed to protect the former scheme from a Section 2 claim, but the truth of the current system is that minority candidates face substantial impediments to election[8] that are too stark for us to dismiss their attendant results as mere happenstance. It is a system that allows only for victory of majority-preferred minority candidates. In essence, any minority serving on the board does so at the sufferance of the majority -- a hollow proportional representation indeed when the minority must rely on majority benevolence to ensure the adequacy of its representation. A system that works for minorities only in the absence of white opposition is a system that fails to operate in accord with the law.

Satisfaction of the necessary[9] <u>Gingles</u> preconditions carries a plaintiff a long way towards showing a Section 2 violation, <u>Jenkins</u>, 4 F.3d at 1116 n.6, 1135; <u>see</u> <u>Clark</u>, 21 F.3d at 97, but in the final analysis Harvell must still show that the challenged

---

[8]In its petition for rehearing the district pointed out that another black person has been appointed to the school board, once again bringing representation into proportion with the black population. This appointment is irrelevant to the ability of black voters to elect the representatives of their choice. Nor does his unopposed reseating in 1993 convince us of the soundness of the election scheme.

[9]The Supreme Court hedged slightly on this notion in <u>De Grandy</u>, at one point calling the preconditions "generally necessary." 114 S. Ct. at 2657. The preeminence of these preconditions in the totality analysis has consistently been recognized in recent opinions by the Supreme Court, however, <u>see</u> <u>Voinovich v. Quilter</u>, 113 S. Ct. 1149, 1157-58 (1993); <u>Growe v. Emison</u>, 113 S. Ct. 1075, 1083-85 (1993), and we continue to accord them their deserved primacy.

electoral scheme provides minority voters "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The totality of the circumstances on the record before us establishes that dilution. See Gomez, 863 F.2d at 1411 (remand not necessary when the record "permits only one resolution of the factual issue" (quoting Pulman-Standard v. Swint, 456 U.S. 273, 287 [sic; 292] (1982))).

The two primary factors considered in our totality analysis are the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme. Gingles, 478 U.S. at 48-49 n.15. As we have discussed, voting practices in the school board elections are highly polarized. There also has been only minimal electoral success under the present scheme, with Dr. Nunn's unopposed reseating as an incumbent in 1990 representing the only minority victory in nine attempts.

The remaining totality factors, although not essential to Harvell's claim, see id., support our conclusion that Harvell has identified a Section 2 violation. No one party to the litigation denies the long history of racial discrimination in the electoral process in Arkansas. See Perkins v. City of West Helena, 675 F.2d 201, 211 (8th Cir.), aff'd mem., 459 U.S. 801 (1982). It is true, as noted by the district court, that strides have been made since the dawn of the civil rights movement, but Arkansas remains by no means idyllic for black voters. Jeffers, 730 F. Supp at 204. We conclude that the district court did not accord sufficient weight to the vestiges of that history. See Westwego Citizens for Better Gov't v. City of Westwego, 872 F.2d 1201, 1211-12 (5th Cir. 1989). So too, the recognized historic effects of discrimination in the areas of health, employment, and education impact negatively on minority political participation. The majority vote requirement, staggered terms, and at-large structure also tend to suppress minority voters' influence. See De Grandy, 114 S. Ct. at 2660-61;

-13-

Collins, 883 F.2d at 1236 (at-large system and staggered terms susceptible of diluting minority votes).  The manner in which those black candidates who were elected managed to obtain and retain their seats attenuates the district's reliance on proportional representation, and similarly heightens our concern over the new election scheme, which while retaining the at-large structure,[10] removes the potential for winning on the basis of a split white vote.

No evidence of a candidate-slating process was adduced, nor was any evidence of racial appeals presented, but the presence of such insidious accoutrements is unnecessary in situations where the process controls the result, and their absence does not preclude finding a Section 2 violation.  Further, the district court's finding that the school board was not unresponsive to the minority community was predicated on its belief that because those black candidates who did serve on the board were the minority-preferred candidates, those who did not win election to the board must have been rejected by black voters as potentially less responsive.  Our earlier discussion of the minority-preferred candidate status counters that proposition.  Even accepting the finding of responsiveness as not clearly erroneous, however, it is similarly insufficient to counter the other factors that censure this scheme.  See Westwego Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1123 (5th Cir. 1991).

The totality of the circumstances on this record leaves us with the firm conviction that the Blytheville school board electoral scheme is institutionally restrictive, thereby creating

_____

[10]Following our decision in the first appeal in this case, the Arkansas legislature amended its school board election law to require seven single-member districts, or five single-member districts and two at-large representatives in all school districts having a minority population of 10% or more.  If a school district has been found to not be in violation of the VRA, it is excepted from this provision.  Ark. Code Ann. § 6-13-631.

-14-

"an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47. Racial polarization effectively cripples minority attempts to effect representation on the school board in the absence of the fortuity of white voter acquiescence. The fact that the current school board election system is less accessible to minority participation than that of ten or twenty years ago runs contrary to the intent and standard of Section 2.

The Supreme Court's recent redistricting decision in Miller does not alter our analysis of the Gingles factors or our ultimate decision in this appeal. Miller analyzed the equal protection problems involved in drawing voting districts along race-based lines, but did not purport to alter our inquiry into the vote-dilution claim. See 115 S. Ct. at 2485-86. We do, however, sound a cautionary note to the district court on remand to steer clear of the type of racial gerrymandering proscribed in Miller, while keeping in mind the need to vindicate the rights of the minority voters.

Our holding that plaintiffs are entitled to relief on their claim perforce forecloses defendant's application for sanctions pursuant to Fed. R. Civ. P. 11 and attorneys' fees pursuant to 42 U.S.C. § 1988.

The judgment is affirmed in part and reversed in part, and the case is remanded to the district court for the entry of an appropriate remedial decree.

LOKEN, Circuit Judge, with whom BOWMAN, MAGILL, BEAM, and MORRIS SHEPPARD ARNOLD, join, dissenting.

In my view, the court relies upon inadequate and unreliable statistical evidence to justify disregarding "consistent and sustained success by [African-American] candidates [that] is

presumptively inconsistent with the existence of a § 2 violation." Thornburg v. Gingles, 478 U.S. 30, 102 (1986) (O'Connor, J. concurring). Therefore, I respectfully dissent.

## A. Insufficient Evidence of Racially Polarized Voting

The district court found that plaintiffs failed to prove the third Gingles precondition, that the white majority in the Blytheville School District "votes sufficiently as a bloc to enable it -- in the absence of special circumstances . . . usually to defeat the minority's preferred candidate." 478 U.S. at 51. To qualify as "legally significant white bloc voting," the Supreme Court explained in Gingles, the white vote must be sufficiently polarized that it will "normally . . . defeat the combined strength of minority support plus white 'crossover' votes." 478 U.S. at 56. In overturning the district court's ultimate finding that the third precondition was not proved, this court relies primarily on a subsidiary finding that voting in Blytheville School Board elections has been "highly polarized." Ante at 13. That is a clearly erroneous finding, improperly made in the first instance by this court, not the district court.

At trial, plaintiffs relied on statistical analysis by their expert, James R. Lynch, a Senior Research Specialist in the Institute of Government at the University of Arkansas at Little Rock. As Appendix I reflects, Lynch submitted District-wide vote totals for every Blytheville School Board election from 1969 to 1992 that included an African-American candidate. He also presented vote totals by voting district for ten of those elections, in 1982, 1987, 1988, 1989, 1990, and 1991. Beyond that, all of Lynch's data were in percentage form. He calculated the black voting age population percentage ("BVAP") for each voting district, based on 1980 census data. He calculated the percent of the vote captured by African-American candidates in each voting district in the ten selected races. He then employed a

"correlation coefficient" to conclude that there was an "overwhelming relationship . . . between BVAP and the percent of vote that the black candidates got."  See Appendix II.  Lynch did not perform an extreme case analysis or a complete bivariate ecological regression analysis, methods the Supreme Court noted are "standard in the literature for the analysis of racially polarized voting."  Gingles, 478 U.S. at 53 n.20.  Thus, the record here contains far less probative statistical data than was developed in other recent Voting Rights Act cases such as National Ass'n for the Advancement of Colored People, Inc. v. City of Niagara Falls, 65 F.3d 1002, 1005-06 & nn. 2-4 (2d Cir. 1995), and Clay v. Board of Educ., 896 F. Supp. 929, 934-36 (E.D. Mo. 1995).[1]

Lynch's statistical analysis was more than inadequate, it was faulty.  His most serious mistake was in equating racially cohesive voting and racially polarized voting, an equation contrary to Gingles.  Racial cohesiveness and racial polarization are elements of different Gingles preconditions.  Political cohesiveness is the second Gingles precondition -- "a showing that a significant number of minority group members usually vote for the same candidates." 478 U.S. at 56.  I agree with the court that Lynch's data tend to show that African-American voters have been politically cohesive in recent Blytheville School Board elections.

Racial polarization, however, is the essential component of the third Gingles precondition -- a pattern of white bloc voting that permits the majority usually to defeat the minority's preferred candidates, thereby diluting the minority's vote.  Racial polarization requires a focus on whether "black voters and white

---

[1]In addition, Lynch was not a properly qualified expert.  He disclaimed expertise in statistics.  He described the correlation coefficient as "simply a technique which one can employ."  He could not explain his use of the "R square" factor, and he did not even attempt to explain the "F value" by which he purported to find statistical significance.  It is doubtful that his statistical analysis and opinions were even admissible under Fed. R. Ev. 702.

voters vote differently." <u>Gingles</u>, 478 U.S. at 53 n.21; <u>Clay</u>, 896 F. Supp. at 935-36.  In making findings of racial polarization, "we rely primarily on actual events and practical politics." <u>Jeffers v. Clinton</u>, 730 F. Supp. 196, 208 (E.D. Ark. 1989), <u>aff'd</u>, 498 U.S. 1019 (1991).  Therefore, in measuring this factor, elections under a prior electoral system, elections in which there was no African-American candidate, the size and influence of the white crossover vote, and the strength of a minority preferred candidate's support become relevant.  <u>See</u> <u>Niagara Falls</u>, 65 F.3d at 1012-17; <u>Southern Christian Leadership Conference v. Sessions</u>, 56 F.3d 1281, 1293 (11th Cir. 1995) (plaintiffs' expert's analysis flawed because he only analyzed elections involving a minority candidate), <u>petition for cert.</u> <u>filed</u>, 64 U.S.L.W. 3318 (U.S. Oct. 12, 1995) (No. 95-647).  For the most part, plaintiffs did not gather such data, and what there is in the record they urge us to ignore.

The district court's finding of "racially polarized" voting reflected Lynch's analytical error:

> The testimony of Mr. James Lynch at trial, based on analyzing past elections and voting patterns, established that <u>voting in the School District is racially polarized</u> <u>in that usually the majority of black voters vote for black candidates and the majority of white voters vote for white candidates.</u>

<u>Harvell</u>, 759 F. Supp. at 527-28 (emphasis added).  This is simply a mislabeled finding of political cohesiveness, the second <u>Gingles</u> precondition.  This court then converts that limited finding into a far broader finding of "highly polarized" voting.  A brief review of the undisputed facts demonstrates that the record will not support this additional finding:

**!**  From 1975 until 1991, two of the eight School Board members were African-Americans.  Until Norvell Moore, a four-term incumbent, elected not to run in 1991, the 29% African-American

-18-

voting age minority had succeeded in electing 25% of the School Board for sixteen straight years, under an entirely at-large election system. Presumptively, therefore, racially polarized white bloc voting has not unlawfully diluted the minority's vote.

❗ In 1982, two African-American candidates each ran against a single white opponent.  Dr. Helen Nunn won, receiving 33% of the votes in precincts having more than an 80% white voting age population.  Incumbent Ayre Lester received 19% of the votes in those precincts and lost.  In 1987, Norvell Moore ran head-to-head against a white opponent.  Mr. Moore received 46% of the votes in those predominantly white precincts and won.  This is undeniable evidence of <u>legally significant</u>, continuing white crossover voting.  Yet it was not assessed by the district court because Lynch did not know the difference between racially cohesive voting and racially polarized voting.  This court then compounds that legal error with the question-begging observation that white crossover voting cannot be legally significant because there has been a finding of "consistent polarization."  <u>Ante</u> at 7.

❗ Plaintiffs' analysis relies on the fact that African-American candidate Shirley Harvell received 79% of the votes cast in 1990 in the predominantly minority Robinson Elementary School voting district.  But Harvell received only 63 votes from that district, whereas Dr. Nunn received 247 votes from that district in her 1982 victory, and Mr. Lester, who barely lost in 1982 despite being in very poor health, received 227 votes at Robinson Elementary School.  Without knowing the size of the voting age population of each district, as well as its percentage of minority voters, we cannot assess whether white bloc voting was the likely cause of Harvell's defeat.

The Supreme Court recently cautioned that "'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive

minority vote by submerging it in a larger white voting population. Unless these points are established, there neither has been a wrong nor can be a remedy." Growe v. Emison, 113 S. Ct. 1075, 1084 (1993) (citation and footnote omitted). This court has improperly transformed the district court's finding that most voters vote for candidates of their own race into a blanket assumption that racially polarized white bloc voting usually prevents the election of minority preferred candidates. The record will not support that appellate court finding. Compare Magnolia Bar Ass'n, Inc. v. Lee, 994 F.2d 1143, 1148-50 (5th Cir.) (where African-American candidates won two high profile elections with 58% and 30% of the white vote, no clear error in finding the third precondition not satisfied despite expert's testimony that white bloc voting was legally significant and these elections were aberrational), cert. denied, 114 S. Ct. 555 (1993).

## B. Minority Preferred Candidates Are Not Usually Defeated

The third Gingles precondition also requires proof that white bloc voting usually will defeat "the minority's preferred candidate."[2] The court finds that all losing African-American candidates since 1987 were minority preferred, looking only at whether they received most of the votes in minority-dominated districts. That is a logical assumption in most cases involving a racially cohesive electorate. But we are reviewing the district court's contrary finding under a clearly erroneous standard that "preserves the benefit of the trial court's particular familiarity with the indigenous political reality." Gingles, 478 U.S. at 79.

---

[2]By submitting data only on elections in which there was an African-American candidate, plaintiffs improperly shifted the Gingles focus from "minority preferred candidates" to "minority candidates." In my view, given the sustained success of many African-American candidates in the recent past, a finding of racially polarized white bloc voting could only be made after thorough analysis of the relative success of the minority preferred candidates in all elections.

-20-

In conducting that review, I begin with what the district court actually found:

> [P]rior to 1988, the lowest number of votes that any black candidate received was 629 and the highest was 1232. On the average, black candidates received nearly 977 votes. On the other hand, since 1988, the most votes received by any black candidate was 374 and the lowest was 135. The average since 1988 has been 237 votes per black candidate. White candidates received an average total of 1264 votes prior to 1988, with the highest being 2212 and the lowest being 606. Since 1988, white candidates have received an average of 1064 votes, with the highest being 1345 and the lowest being 758. The following chart of averages is helpful.
>
> |  | White Candidates | Black Candidates |
> |---|---|---|
> | 1969-1987 | 1264 | 977 |
> | 1988- | 1064 | 237 |
> | Percent Change | 15.8% | 75.7% |
>
> . . . The Court is of the opinion that none of the black candidates since 1988 have been the "preferred" candidate of the black community. . . . Plaintiffs have failed to show that the reason they are unable to maintain proportional representation is because of the way the white majority votes . . . . Indeed, one of the candidates who had been the overwhelming choice of the black population [Norvell Moore] chose not to run for reelection.

A review of the entire record persuades me that this finding is not clearly erroneous:

**!** If the eight unsuccessful African-American candidates since 1987 had received as many votes as Dr. Nunn received in her successful contested race in 1982 (the first time she ran), three would have won outright and two more would have forced run-off elections under the new majority-vote rule. (Given the results of prior elections, the court's speculation that whites will always win run-off elections, <u>ante</u> at 10-11, is unwarranted.)

**!** In 1988, African-American candidate Curtis Smith lost an election to white candidate Bill Sullivan, 758 to 166.  Smith <u>did not carry</u> the Mississippi County Implement Company district, which has a BVAP of 80%, by far the highest of any voting district.  Yet the court finds that Smith was the minority preferred candidate.

**!** Plaintiffs' Exhibit 26, a copy of the official election returns, reports that in 1990, white candidate Littrell received 62 votes and plaintiff Harvell received 7 votes in the East End Fire Station district, one of three districts having a higher BVAP than the Blytheville School District as a whole.  Plaintiffs' Exhibit 14, prepared by Lynch, reports that plaintiff Harvell captured 60% of the vote in that district, rather than the 10% she actually received.  Based upon Lynch's grievous error, plaintiffs contend and now this court finds that Harvell was the minority preferred candidate in that election.

**!** The votes cast in the two districts with a BVAP majority accounted for 26% of the total votes in the 1982 election (when Dr. Nunn won and Mr. Lester barely lost), but only 14% of the votes in 1989, 12% in 1990, and 13% in 1991.

**!** Only one African-American candidate since 1987 has received a majority of the votes cast in the district that most closely mirrors the total School District population (40% minority).  In 1982, Dr. Nunn and Mr. Lester received over 75% of the votes in a similar district.

In my view, this is overwhelming evidence that factors other than racially polarized voting, or the 1987 election law change, account for the election defeats of African-American candidates in recent years.  Yet the court dismisses the obvious import of this evidence with the comment that it "stands to reason" that the 1987 change in the law caused the precipitous drop in minority voter turnout.  <u>Ante</u> at 8.  I disagree. Prior to 1987, African-American

candidates had won four of the previous five contested elections against white candidates. They had received an absolute majority in two of the previous three elections. With that voting history, only preconceived notions of racial voting behavior could lead the court to conclude that the majority-vote rule caused minority voters to lose all hope of success.

We should not forget that we deal here with the politics of education, not with the election of general purpose legislators. Dr. Nunn testified on cross examination that she opposed single-member districts "[b]ecause I have spent my life working with the total community, working together, and I think that's one way to improve quality of education." Plaintiff Hattie Middlebrook, an unsuccessful candidate in 1990, testified that Board members Norvell Moore and Dr. Nunn were no longer minority preferred candidates because of their consensus-building political views. On this record, I reject the court's unsupported speculation that it was the spectre of white bloc voting, or the change to majority rule in 1987, that caused the vast majority of potential African-American voters not to support candidates such as Ms. Middlebrook. The district court's findings as to the third Gingles precondition should be affirmed.

### C. Consistent and Sustained Minority Representation

In Gingles, six Justices agreed that "consistent and sustained success by candidates preferred by minority voters is presumptively inconsistent with the existence of a § 2 violation." 478 U.S. at 102 (O'Connor, J., concurring). While proportional minority representation is not a safe harbor that automatically defeats a claim of vote dilution, it should be given "extremely heavy weight." African Am. Voting Rights Legal Defense Fund, Inc. v. Villa, 54 F.3d 1345, 1355-56 (8th Cir. 1995). Section 2 does not "require maximization of minority-group representation." Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist., 56 F.3d 904,

910 (8th Cir. 1995) (no § 2 violation where minority comprising 29% of the district's voting age population has held 28.6% of the Little Rock School Board seats continuously for twenty years).

In this case, an African-American has held a seat on the School Board every year since 1974, and there were two African-Americans on the Board -- proportional representation -- for sixteen consecutive years. The court dismisses this "consistent and sustained success" as the product of "special circumstances." For example, the court disregards Dr. Nunn's most recent success because she ran unopposed for a third term in 1990. While Gingles noted that incumbency and lack of opposition may be "special circumstances" that do not disprove a racially polarized electorate, a finding to that effect requires factual analysis. Dr. Nunn's prior victories and standing in the at-large community may well have persuaded potential white candidates that she was unbeatable. In a district with only 29% minority voters, that would be strong evidence that the electorate is not so racially polarized that African-Americans "have less opportunity . . . to elect representatives of their choice," the ultimate issue under § 2. See Sanchez v. Bond, 875 F.2d 1488, 1493 (10th Cir. 1989), cert. denied, 498 U.S. 937 (1990). "It borders on the absurd, of course, to suggest that an individual's success in politics should be discounted as aberrational because the person is qualified and popular." Niagara Falls, 65 F.3d at 1021 n.22.

I am particularly distressed by the court's suggestion that the challenged system violates § 2 because it "allows only for victory of majority-preferred minority candidates," ante at 12, and its criticism of the manner in which successful African-American candidates "managed to obtain and retain their seats," ante at 14. Apparently, the court believes that only a racially balkanized election system can comply with the Voting Rights Act. I subscribe to a contrary principle -- that "[n]o legal rule should presuppose the inevitability of electoral apartheid -- least of all a rule

interpreting a statute designed to implement the Fourteenth and Fifteenth Amendments to the Constitution." Niagara Falls, 65 F.3d at 1016.

## D. Conclusion

For the foregoing reasons, I conclude that plaintiffs have failed to prove that legally significant white bloc voting in the Blytheville School District usually defeats a minority preferred candidate. Accordingly, they have not satisfied the third Gingles precondition, nor have they established by a totality of the circumstances that the challenged election system results in the minority vote dilution that § 2 prohibits.

I do not know whether the 1987 majority-vote law will ultimately work to deprive minority voters in the Blytheville School District of their rights under § 2. It may be that minority-preferred candidates will emerge but persistently fail to achieve proportional electoral success. In that case, § 2 relief will no doubt be warranted because, in the presence of strongly polarized white bloc voting, a majority-vote rule combined with at-large voting districts and a 30% minority voting age population most likely violates § 2. Cf. City of Port Arthur v. United States, 459 U.S. 159, 167 (1982). But absent proof of sufficiently polarized white bloc voting, § 2 relief should be denied.[3] Our function under the Voting Rights Act is not "to dictate to the

_____

[3]If plaintiffs were entitled to relief, it would only be an injunction against the 1987 majority-vote rule. The court's opinion implies that the district court must now enter an "appropriate remedial decree" creating single-member voting districts. Given the sustained success of minority preferred candidates under the prior, plurality at-large system, this remedy violates the congressional intent that the 1982 amendments to § 2 not be construed as "an all-out assault on at-large election systems in general." S. Rep. No. 417, 97th Cong., 2d Sess. 27 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 205. Thus, I also dissent from the remedial portion of the court's decision.

provinces the 'correct' theories of democratic representation, the 'best' electoral systems for securing truly 'representative' government, the 'fairest' proportions of minority political influence, or . . . the 'proper' sizes for local governing bodies." <u>Holder v. Hall</u>, 114 S. Ct. 2581, 2602 (1994) (Thomas, J., concurring). Therefore, I would affirm.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

The following table is a compilation of election results for the Blytheville, Arkansas, School Board from 1969 to 1992. Black candidates are designated by "B" and white candidates are designated by "W."

| YEAR | CANDIDATES | B/W | VOTES |
|------|-----------|-----|-------|
| 1969 | Dr. James C. Guard<br>Mrs. Carrie B. White | W<br>B | 1,014<br>769 |
| 1970 | Mason F. Day, Jr.<br>O. W. Weaver | W<br>B | 2,212<br>1,074 |
| 1973 | W. J. Tomlinson<br>Rev. T. J. Green | W<br>B | 1,068<br>907 |
| 1974 | Edwin L. Holstead<br>Dan M. Burge<br>Ayre E. "Pop" Lester | W<br>W<br>B | 415<br>885<br>1,232 |
| 1975 | George "Preacher" Nichols<br>Richard "Dick" Reid<br>Bill D. Jackson<br>Mrs. Allen Bush<br>Norvell Moore | W<br>W<br>W<br>W<br>B | 182<br>582<br>331<br>812<br>1,068 |
| 1978 | Ayre E. "Pop" Lester | B | Unopposed |
| 1979 | Norvell Moore | B | Unopposed |
| 1982 | Jerry Nall<br>Ayre E. "Pop" Lester<br><br>Harold Edwards<br>Dr. Helen Nunn | W<br>B<br><br>W<br>B | 1,107<br>948<br><br>901<br>1,187 |
| 1983 | Norvell Moore | B | Unopposed |
| 1986 | Dr. Helen Nunn | B | Unopposed |
| 1987 | Edwin L. Holstead<br>Norvell Moore | W<br>B | 606<br>629 |

| 1988 | Bill Sullivan | W | 758 |
| | Curtis "Preacher" Smith | B | 166 |
| 1989 | Harold Sudbury, Jr. | W | 1,302 |
| | Thurman J. Green, II | B | 287 |
| | | | |
| | Steve Littrell | W | 1,299 |
| | Shirley M. Harvell | B | 305 |
| | | | |
| | Steward R. Jerome | W | 1,226 |
| | Lawrence B. Haley | B | 374 |
| 1990 | Steve Littrell | W | 810 |
| | Shirley Harvell | B | 135 |
| | | | |
| | Dr. Helen Nunn | B | Unopposed |
| 1991 | Karen Sue Fraser | W | 927 |
| | Phyllis Bloodworth | W | 388 |
| | Hattie G. Middlebrook | B | 232 |
| | | | |
| | James T. McMahan | W | 861 |
| | Doug Wilson | W | 484 |
| | Shirley Harvell | B | 223 |
| 1992 | Bill Sullivan | W | Unopposed |
| | | | |
| | Bill Stovell, III | W | 456 |
| | Shirley Milliken | B | 173 |

| YEAR | CANDIDATES | CORRELATION COEFFICIENT* |
|---|---|---|
| 1988 | Bill Sullivan<br>Curtis "Preacher" Smith | 0.8437 |
| 1989 | Harold Sudbury, Jr.<br>Thurman J. Green, II | 0.9582 |
|  | Steve Littrell<br>Shirley M. Harvell | 0.9674 |
|  | Steward R. Jerome<br>Lawrence B. Haley | 0.9673 |
| 1990 | Steve Littrell<br>Shirley M. Harvell | 0.9086 |
| 1991 | Karen Sue Fraser<br>Hattie G. Middlebrook | 0.942 |
|  | James T. McMahan<br>Shirley M. Harvell | 0.928 |
| 1992 | Bill Stovell, III<br>Shirley Milliken | 0.838 |

* The Correlation Coefficient (the "r" statistic) measures the strength of a relationship between two variables.  The "r" may range from 0.0 (indicating the two variables are independent) to +1.0 (indicating the two variables are perfectly correlated in a positive direction).