GREGG COSTA, Circuit Judge,
dissenting from Part 11(A)(1):
The six years of debate in the Texas Legislature before voter ID passed dera- *329 onstrates that it is a controversial political question. The opinions issued today demonstrate it also raises contentious legal questions. And with respect to how to assess vote denial (as opposed to vote dilution) claims under the “effects” test of the Voting Rights Act, it is a difficult one. Although I join the majority opinion "affirming the district court’s holding that the Texas law has discriminatory effects in violation of the Act, the Gingles factors are not a perfect fit for the vote denial claims that have blossomed in the post-Shelby County world. But for the reasons set forth in the majority opinion and Judge Higginson’s concurring opinion, it is the best guidance we have for evaluating such cases.
In contrast to the uncertain legal terrain for the discriminatory effects claim, the discriminatory purpose claim can be resolved through application of two entrenched legal principles: the deference that appellate courts owe to factfinders and the Arlington Heights framework for evaluating circumstantial evidence of discriminatory purpose.[1] See Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); Village of Arlington Heights v. Metropolitan Housing Develop. Corp., 429 U.S. 252, 266-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). That deference requires that we overturn a district court’s factual findings only if they are clearly erroneous, which means substantial evidence did not support the finding, the court misinterpreted the effect of the evidence, or the findings are against the preponderance of credible evidence.. See Fed. R. Civ. P. 52(a)(6); Water Craft Mgmt. LLC v. Mercury Marine, 457 F.3d 484, 488 (5th Cir.2006). To reverse under the clear error standard, we must have “a definite and firm conviction that a mistake has been committed.” Id. (quoting Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 375 (6th Cir.2000)).
That deference is the reason it is hard to find appeals of bench trials involving private law causes of action in which we have concluded that the factual findings were clearly erroneous. This year alone, we have affirmed such findings in bankruptcy,[2] maritime,[3] Fair Labor Standards Act,[4] ERISA,[5] insurance,[6] and oil and gas[7] cases. In none of those cases did we subject the evidence to exacting scrutiny or reweigh it. That is not a dereliction of appellate duty. It is as it should be. So long as the “district court’s account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals *330 may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” U.S. Bank Nat. Ass’n v. Verizon Commc’ns, Inc., 761 F.3d 409, 431 (5th Cir.2014) (affirming district court’s valuation finding in fraudulent transfer case) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).
But it is easier to find recent public law cases in which we have not upheld factual findings, despite the deferential standard of review.[8] See Aransas Project v. Shaw, 774 F.3d 324, 326 (5th Cir.2014) (Prado, J., dissenting from denial of rehearing en banc) (citing Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 769 F.3d 330, 335 (5th Cir.2014) (Dennis, J., dissenting from denial of rehearing en banc)). This case adds to the list. That is so despite the rule that “[l]egislative motivation or intent is a paradigmatic fact question.”[9] Prejean v. Foster, 227 F.3d 504, 509 (5th Cir.2000) (citing Hunt v. Cromartie, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)).
So what are the reasons why the majority opinion, despite noting significant evidence “that could support a finding of discriminatory intent,” Maj. Op. at 235, does not defer to that finding? There are two: the district court relied “too heavily on the evidence of State-sponsored discrimination dating back hundreds of years” and “on post-enactment speculation by opponents of SB 14.” Maj. Op. at 230-31, 232. As discussed below, however, virtually none of this evidence that the majority opinion critiques appears in the district court’s analysis of the discriminatory purpose claim. See Veasey v. Perry, 71 F.Supp.3d 627, 698-703 (S.D. Tex. 2014).
With respect to the use of history, I read not only the district court’s opinion but also the case law differently. As legal support for the view that the district court gave too much weight to “long-ago history,” the majority opinion relies principally on Shelby County v. Holder, — U.S. -, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013). Maj. Op at 231 & n.14. Shelby County held that Congress exceeded its power under the Fifteenth Amendment in subjecting nine states to the “extraordinary measure[ ]’’ of having to preclear every change in voting laws. Id. at 2619. It found Congress’s formula for selecting these states unconstitutional because it relied on “decades-old data and eradicated practices,” in particular the use of literacy tests which had long been abolished and *331 voter registration and turnout numbers that had “risen dramatically” since 1965 when the Voting Rights Act was first enacted. Id. at 2627.
Shelby County was not a case about purposeful discrimination under the Fourteenth Amendment or Section 2 of the Voting Rights Act. It makes no mention of Arlington Heights. For those reasons alone, Shelby County should not be used to curtail the use of an Arlington Heights factor. See Rodriguez de Quijas v. Shear-son/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (“If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overturning its own decisions.”).
But even if we did have the freedom to engage in a law review-like debate about what Shelby County foretells for the use of history as circumstantial evidence under Arlington Heights, history is being used very differently in the two contexts. Shelby County rejected the use of 50-year-old history alone to impose the “stringent” requirement of preclearance. That pre-clearance requirement, which applied to new laws carrying no hint of unconstitutionality (even ones that increased access to voting), was an exception to the normal practice of using “case-by-case litigation” to enforce constitutional rights. 133 S.Ct. at 2624. In the example of case-by-case litigation here that seeks to establish a current constitutional violation, Arlington Heights just says that history is one of many factors that may be considered. And it’s not just any history that courts should consider, but a historical background that “reveals a series of official actions taken for invidious purposes.” Arlington Heights, 429 U.S. at 267, 97 S.Ct. 555.
That type of pattern-or-practice evidence exists here. As the majority opinion recognizes, most of the discriminatory laws the district court recounted — all-white Democratic primaries; literacy tests; poll taxes; and the annual re-registration requirement that Texas imposed after the poll tax was abolished — were justified with the same interest cited for voter ID: prevention of voter fraud. Maj. Op. at 236-37. Another thread, again recognized by the majority opinion, running from prior restrictive voting laws to SB 14 is that they have typically been enacted (by both political parties) in response to a perception of increased voting power by emerging demographic groups.[10] Maj. Op. 239^1 & n.30; 71 F.Supp.3d at 700. The district court thus did not just say “there was discrimination in the past, so there must be discrimination today;” it tied historical patterns to features of the law being challenged, as Arlington Heights contemplates.
Despite recognizing that this connection was made with respect to both the voter fraud rationale and historical practice of enacting voting restrictions in response to potential increases in minority voting strength, the majority opinion nonetheless holds that the district court relied too much on “evidence of State-sponsored discrimination dating back hundreds of years.” Maj. Op. at 231. To be sure, historical evidence limited to the nineteenth century is of “little probative value.” McCles- *332 key v. Kemp, 481 U.S. 279, 298 n.20, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (discounting, under Arlington Heights, historical evidence focused only on “Georgia laws in force during and just after the Civil War” because it was not reasonably contemporaneous with enactment of the challenged law). But I just don’t see that the district court’s finding of discriminatory purpose relied on such history at all, let alone to a significant degree.
The majority opinion’s contrary view seems to flow from its scrutiny of the entire district court opinion for any references to evidence that may not be probative of discriminatory intent. But the district court had before it not just the purpose question, but claims involving discriminatory effects, impact on First Amendment interests under the Anderson/Burdick balancing test, and whether the voter ID imposed a poll tax. As is customary with bench trial rulings, the district court first summarized the testimony and facts from the entire trial. Only after that discussion, which was lengthy given the vast record, did it proceed to analyze the particular claims and identify the evidence that supported its legal conclusions for each. In reviewing the factual sufficiency of the finding of discriminatory purpose, our review should focus on the district court’s analysis of that particular claim.
One looking at that section of the district court’s decision after reading today’s opinions with their focus on history would be surprised that this is the only mention of it:
Historical Background. As amply demonstrated, the Texas Legislature has a long history of discriminatory voting practices. To put the current events into perspective, Texas was going through a seismic demographic shift at the time the legislature began considering voter ID laws. Hispanics and African-Americans accounted for 78.7% of Texas’s total population growth between 2000 and 2010. In addition, it was during this time that Texas first became a majority-minority state, with Anglos no longer comprising a majority of the state’s population. As previously discussed, this Court gives great weight to the findings of Dr. Lichtman that ‘[t]he combination of these demographic trends and polarized voting patterns ... demonstrate that Republicans in Texas are inevitably facing a declining voter base and can gain partisan advantage by suppressing the overwhelmingly Democratic votes of African-Americans and Latinos.’
71 F.Supp.3d at 700 (alterations in original) (footnotes omitted). The natural reading of this single paragraph is that the general first sentence is providing background, and it is only the demographic changes that the court is citing as the Arlington Heights context for “the current events.” The majority opinion not only finds no error with this latter conclusion, but endorses its relevance. Maj. Op. at 239-41.-
Even if one reads the footnote at the end of the first sentence as fully incorporating the opening section of the opinion that chronicles “Texas’s history with respect to racial disparity in voting rights,”[11] id. at 700 n.535 (citing id. at 633-39), I don’t see that historical overview as er *333 ror.[12] Not so long ago, the Supreme Court recited the same history of voting rights in Texas:
Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State’s minority voting rights history. The history of official discrimination in the Texas election process — stretching back to Reconstruction — led to the inclusion of the State as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions.
LULAC v. Perry, 548 U.S. 399, 439-40,126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (quoting Vera v. Richards, 861 F.Supp. 1304, 1317 (S.D. Tex. 1994)). Deeming a similar discussion here to be legal error risks making rhetoric a basis for reversal. The natural starting point of any historical discussion is the beginning. Maj. Op. at 232 n.14 (recognizing that “history (even ‘long-ago history’) provides context to modern-day events”). And the bigger problem of locating error in sections of the district court’s opinion that do not even analyze the claim at issue is that it results in the fact finding of judges being much more susceptible to reversal than those of juries, which do not have to summarize the evidence or provide reasons for their decisions.
This improper focus on the district court’s summary of the evidence rather than its later analysis of the discriminatory purpose claim is just as pronounced when it comes to the statements of bill opponents with which the majority opinion also finds fault. Maj. Op. at 232-33. Those comments appear nowhere in the one-paragraph discussion of “Contemporaneous Statements,” 71 F.Supp.3d at 702, or anywhere else in the discriminatory purpose analysis. Instead, they appear in a section recounting testimony (from both sides) about the “Method and Result of Passing SB 14.” Id. at 655-57. The discussion of “Contemporaneous Statements” that does appear in the purpose analysis is balanced, noting that “there are no ‘smoking guns’ in the form of an SB 14 sponsor making an anti-African-American or anti-Hispanic statement.” Id. at 702. The only legislator quoted is not an opponent, but bill supporter Todd Smith who admitted it was “common sense” that voter ID would have disproportionate effects on racial minorities. Id. The majority opinion cites that testimony as relevant evidence for the purpose claim. Maj. Op. at 236. That leaves only the district court’s conclusion that the 2011 , legislative session was racially charged in light of other pending legislation, id. at 702, which seems like an inference a factfinder should be entitled to draw.
But even if not, with that factual finding being the only one specifically mentioned in the district court’s discussion of discriminatory purpose with which the majority opinion finds fault, it does not seem like a *334 sufficient basis for reaching “a definite and firm conviction that a mistake has been committed” as to the ultimate finding. Canal Barge Co. Inc., 220 F.3d at 375. That is especially so when the majority opinion endorses the district court’s reliance on just about all the other evidence it actually did cite in assessing the Arlington Heights factors. See Maj. Op. at 235-41. In light of that discussion and the district court opinion, there is no value in repeating that evidence here. The only thing to add is that the district court correctly recognized that the discriminatory impact of the law (for which the majority opinion finds sufficient evidentiary support on the “effects” claim and which even Judge Jones’s dissent does not dispute, see Jones Dissent at 5) can also be considered in evaluating discriminatory purpose. See Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555 (noting that “[t]he impact of the official action whether it ‘bears more heavily on one race than another,’ may provide an important starting point” in the “sensitive inquiry into [] circumstantial and direct evidence of intent”) (quoting Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); Jim Sowell Const. Co. v. City of Coppell, 61 F.Supp.2d 542, 547 (N.D. Tex. 1999) (citing Arlington Heights for the proposition that “circumstantial evidence regarding the impact of its official actions” can be evidence of discriminatory purpose). Yet the majority opinion does not list discriminatory impact as a consideration in the purpose inquiry, Maj. Op. at 229-30, despite recognizing that those likely effects were known prior to enactment, which would seem to make the discriminatory impact an even more probative consideration in determining purpose. I would therefore conclude that there was sufficient evidence from which the district court could have reasonably concluded that the law was enacted with a discriminatory purpose, even if, as is usually the case in hotly contested trials, there is also evidence to support the opposite view.
Vacating the finding of discriminatory purpose not only is at odds with the deference owed the factfinder, but also causes delay in the ultimate resolution of this case that could impose significant costs. Voter ID was passed five years ago. Litigation concerning its lawfulness has been ongoing for more than four years.[13] Even more concerning than mere delay, however, is the possibility of Texas elections being conducted under ever-changing rules. Since SB 14’s enactment, elections have been conducted under its terms. The upcoming November 2016 is now likely to be conducted under a remedy for the effects violation that limits the discriminatory impact of the law but that leaves some of it in place. Depending on how the discriminatory purpose claim is decided on remand, the next cycle of elections might be conducted with a voided SB 14 playing no role. Such frequent changes in the voting rules carry a substantial risk of increased confusion. It is that uncertainty over voting requirements that some studies' — including a recent joint study from Rice University’s Baker Institute for Public Policy and the University of Houston’s Hobby Center for Public Policy — have found to be one of the more significant ways in which voter ID laws depress turnout. See MARK Jones, et. al., The Texas Voter ID Law and the 2014 Eleotion: A Study of Texas’s 23rd Con *335 GREssional DISTRICT 13 (2015) (noting that its study of voter turnout under SB 14 “suggests] that the most significant impact of the current Texas voter ID law is confusion and subsequently depressed voter turnout”).
* * *
Reluctance to hold that a legislature passed a law with a discriminatory purpose is understandable. Maj. Op. 231 (“We acknowledge the charged nature of accusations of racism, particularly against a legislative body .... ”). Yet courts are called upon all the time to decide difficult questions about whether state legislatures or Congress have violated other important constitutional values like, taking the First Amendment as just one example, the right to free speech or free exercise of religion. When we find that they have done so, it doesn’t exactly east those lawmakers in the best of light.
It is also important to note that affirming the finding of discriminatory purpose[14] would not be the inflammatory “racial name-calling” that Judge Jones’s dissent suggests. Jones Dissent at 281. Such a finding, although one of grave importance, is not tantamount to a finding that the law had a “racist motivation.” Id. at 281; Elrod Dissent at 326 (characterizing question as whether “the Legislature acted on the basis of racism”); see also Maj. Op. at 230-31 (also indicating that such a finding requires a showing of “racism”). As Judge Kozinski explained in a decision upholding a district court determination that a discriminatory purpose motivated a Los Angeles county reapportionment plan, nothing in an opinion finding discriminatory purpose needs to even “suggest[j” that lawmakers “harbored any ethnic or racial animus.” Garza v. Cnty. of Los Angeles, 918 F.2d 763, 778 (9th Cir.1990) (Kozinski, J., concurring) (explaining that “there is no indication that what the district court found to be intentional discrimination was based on any dislike, mistrust, hatred or bigotry against Hispanics or any other minority group”).[15] The discriminatory pur *336 pose can instead be the product of “elected officials engaging] in the single-minded pursuit of incumbency.” Id.) Ketchum v. Byrne, 740 F.2d 1398, 1408 (7th Cir.1984) (observing that' “many devices employed to preserve incumbencies are necessarily racially discriminatory”). That most basic of human instincts — self-preservation—can thus provide an explanation for enacting a law at least in part because it will have a disparate impact on protected groups that favor the out-of-power party. 71 F.Supp.3d at 700; see also Frank v. Walker, 773 F.3d 783, 790-93 (7th Cir.2014) (Posner, J., dissenting from denial of rehearing en banc) (discussing studies and other evidence supporting the view that voter ID laws, although not resulting in “huge” decreases in turnout, have an effect primarily on “low-income and minority groups” that favor Democrats). Indeed, the highly polarized nature of voting in Texas along racial lines (according to exit polls from the last gubernatorial election, 72% of whites, 44% percent of Latinos, and 7% of African-Americans voted for the Republican winner[16]) makes depressing minority turnout a strong proxy for suppressing Democratic turnout.
A judge who agrees with Judge Jones’s dissent that “partisanship, not race,” is a likely reason why the Texas Legislature 'enacted SB 14 can thus still conclude that the law was enacted with a discriminatory purpose. Jones Dissent at 246 (“No doubt Republicans would not have pressed for voter ID if they felt it would largely enhance Democrat voting.”); id. at 303 (“The law reflects party politics, not racism ... ”). If that desire for partisan advantage (or any other underlying motivation) leads a legislature to select a “course of action at least in part ‘because of,’ not merely ‘in spite of,’ its adverse effects upon an identifiable group,”[17] that is enough. See Garza, 918 F.2d at 778 (Kozinski, J., concurring). This different starting point for assessing the discriminatory purpose claim — that is, a mistaken premise that the record has to support a finding of outright racism — perhaps explains why today’s opinions take such widely divergent views of the evidence.

. Even with our affirmance of the discriminatory effects finding, the purpose claim must still be resolved. Not only would a finding of discriminatory purpose lead to a different remedy with respect to the voter ID law, but it could also subject Texas to preclearance for future voting changes. 52 U.S.C. § 10302(c).

. In re Monge, 826 F.3d 250, 2016 WL 3269032 (5th Cir. June 14, 2016).

. Grogan v. W & T Offshore, Inc., 812 F.3d 376 (5th Cir.2016); Alebamon Marine Servs., L.L.C. v. Ocean Marine Contractors Scrap Div., L.L.C., 2016 WL 1358948 (5th Cir. Apr. 5, 2016); Osprey Underwriting Agency, Ltd. v. Nature’s Way Marine, L.L.C., 642 Fed.Appx. 391 (5th Cir.2016).

. Steele v. Leasing Enter., Ltd., 826 F.3d 237, 2016 WL 3268996 (5th Cir. June 14, 2016); Fairchild v. All American Check Cashing, Inc., 815 F.3d 959 (5th Cir.2016).

. Perez v. Bruister, 823 F.3d 250 (5th Cir.2016).

. Seahawk Liquidating Trust v. Certain Underwriters at Lloyds London, 810 F.3d 986 (5th Cir.2016).

. Akuna Matata Invs. Ltd. v. Texas Nom Ltd. P’ship, 814 F.3d 277 (5th Cir.2016).

. Because these cases often have such a significant impact (the instant case involves a law setting voting requirements for a state of more than 25 million people), it may be natural to be hesitant about giving a single district judge so much discretion in deciding the fate of a law. Indeed, it used to be the case that lawsuits challenging the constitutionality of a state or federal law had to be heard by three-judge panels. 28 U.S.C. §§ 2281, 2282 (repealed 1976). For better or worse, Congress did away with that system in 1976. Act of Aug. 12, 1976, Pub. L. No. 94-381, 90 Stat. 1119; see also 17A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4235 (3d ed.) (discussing history, purpose, and current status of Congressionally required three-judge panels). With these cases now being decided by a single judge as most others are, there is no basis for altering the level of deference based on the subject matter of the case.

. In the context of private Title VII suits, discriminatory intent was the disputed issue in two of the leading Supreme Court cases emphasizing the deference that district courts are owed on questions of fact. Anderson, 470 U.S. at 574-75, 105 S.Ct. 1504 (intent to discriminate on basis of sex); Pullman-Standard, 456 U.S. at 290, 102 S.Ct. 1781 (rejecting in race discrimination case "the Fifth Circuit rule that a trial court’s finding on discriminatory intent is not subject to the clearly-erroneous standard of Rule 52(a)”).

. This historical practice is not limited to Texas or other southern states. In response to the growth of Irish immigrants who tended to favor Democrats, the Know-Nothing movement led to the passage of more restrictive voting laws in Connecticut, Massachusetts, and New York during the 1850s. See Alexander Kbyssar, The Right to Vote: The Contested History of Democracy in the United States 68 (rev. ed. 2009).

. Because the opening sentence of the paragraph just refers to the Texas Legislature's history of enacting discriminatory voting laws, there is no plausible reading that would allow it to incorporate prior summaries of testimony in the opinion that involve the discriminatory voting acts of a single county (Waller County), another item the majority opinion criticizes.

. The only parts of that section that refer to events "dating back hundreds of years” are a benign introductory statement that "On the heels of Reconstruction, freed slaves and other minority men were just gaining access to the right to vote,” and headings for topics like the poll tax and literacy tests that, owing to the duty of historical accuracy, list the entire period they were in existence ("1905-1970: Literacy and ‘Secret Ballot’ Restrictions”; "1902-1966: Poll Taxes”). 71 F.Supp.3d at 634.

. The preclearance regime was still in effect when the law was enacted. DOJ denied pre-clearance, but in 2012 Texas sought a judicial determination of that question by a three-judge panel. See Texas v. Holder, 888 F.Supp.2d 113 (D.D.C. 2012), vacated, - U.S. -, 133 S.Ct 2886, 186 L.Ed.2d 930 (2013). After Shelby County, the lawsuits we are considering were filed in 2013.

. It’s also worth again emphasizing that unlike the findings of constitutional violations we usually make in cases that present purely legal questions, affirming the district court here would not be a direct ruling from this court that the law was passed with a discriminatory purpose, only that there was evidence from which a factfinder could draw that conclusion.

. Judge Jones’s dissent states that Garza is one of only a handful of cases in recent decades finding that a law was enacted with a discriminatory purpose. Jones Dissent at 332 n.ll. Notably, it was a voting rights case from a jurisdiction not covered by the Voting Rights Act’s preclearance, requirements. See also Stabler v. Cnty. of Thurston, Neb., 129 F.3d 1015, 1022 (8th Cir. 1997) (finding intentional discrimination in redistricting plan of non-covered Nebraska county). For the nine covered states (a number of counties from other states were also subject to pre-clearance), there was little incentive for a challenger to bring a claim of purposeful discrimination prior to Shelby County. One of the requirements for preclearance was for the public entity enacting the change to disprove that the voting change had a discriminatory purpose or effects. Reno v. Bossier Parish School Bd., 520 U.S. 471, 477-78, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (citing 42 U.S.C. § 1973c). The impact that making the typically easier-to-prove effects test an equally powerful avenue of relief has on purpose claims can be seen from the drop in the number of discriminatory purpose claims brought in voting cases after the 1982 amendments to the Voting Rights Act made effects a basis for section 2 liability in response to City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1519, 64 L.Ed.2d 47 (1980) (interpreting prior version of section 2 to require finding of discriminatory purpose). In cases litigated on the eve of the 1982 amendments, three courts of appeals (including ours) had found discriminatory purpose in the enactment or maintenance of local electoral systems. See Lodge v. Buxton, 639 F.2d 1358, 1380 (5th Cir. Unit B 1981), aff'd sub nom. Rogers v. Lodge, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 *336 (1982); N.A.A.C.P. by Campbell v. Gadsden Cnty. Sch. Bd„ 691 F.2d 978, 982 (11th Cir.1982); Perkins v. City of W. Helena, Ark., 675 F.2d 201, 216 (8th Cir.1982),.aff'd sub nom. City of W. Helena, Ark. v. Perkins, 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982) (all finding that at-large electoral system was created or maintained for discriminatory purpose).
Outside the voting context where effects became challengers’ preferred claim, there are more examples of courts finding discriminatory purpose, mostly in the area of school desegregation and housing. See, e.g., United States v. City of Yonkers, 96 F.3d 600, 618-19 (2d Cir.1996) (school); Diaz v. San Jose Uni fied Sch. Dist., 733 F.2d 660, 675 (9th Cir.1984) (school); Smith v. Town of Clarkton, N.C., 682 F.2d 1055, 1066-67 (4th Cir.1982) (housing); United States v. Texas Ed. Agency, 600 F.2d 518, 527 (5th Cir. 1979) (school); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 144-45 (3d Cir.1977) (housing).

. Governor: Texas (Abbott vs. Davis) — Exit Polls (2014), CNN: 2014 Election Center,http://www.cnn.com/election/2014/results/ state/TX/governor/.

. Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).